IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
No. 5:14-CV-352-F

| | |
|---|---|
| TRAMILLA CARPENTER, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | **ORDER** |
| ) | |
| DAVID SEAGROVES, in his individual ) | |
| and official capacities, ) | |
| ) | |
| Defendant. ) | |

Before the court is Defendant David Seagroves' Motion for Summary Judgment [DE 55] pursuant to Rule 56 of Federal Rules of Civil Procedure. Plaintiff Tramilla Carpenter, proceeding *pro se*, responded.[1] Defendant did not file a reply. [DE 63]. For the reasons set forth below, Defendant's motion is allowed.

## I. STATEMENT OF FACTS[2]

In 2014, Plaintiff initiated this excessive force action pursuant to 42 U.S.C. §§ 1983 and 1985 against Seagroves and Robert T. Snider, Jr.[3] – police officers with the City of Wilson – and the City of Wilson Police Department, stemming from the stop of Plaintiff's vehicle and her

---

[1] Plaintiff's response includes references to factual allegations in her complaint and amended complaint. First, an amended complaint generally supersedes any previous complaint, rendering the original pleading "of no legal effect." *Young v. City of Mount Ranier*, 238 F.3d 567, 573 (4th Cir. 2001). Second, allegations contained in a pleading (e.g., an amended complaint) are not evidence; thus, they cannot defeat a motion for summary judgment. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986) ("Rule 56(e) permits a proper summary judgment motion to be opposed by any of the kinds of evidentiary materials listed in Rule 56(c), except the mere pleadings themselves ....").

[2] In accordance with the standard of review for a motion for summary judgment, the court sets forth the facts in the light most favorable to Plaintiff, the non-movant. *See Tolan v. Cotton*, __U.S.__, 134 S. Ct. 1861, 1863 (2014).

[3] Plaintiff's complaint identified Snider as "Officer Snyder."

subsequent arrest on June 17, 2011 (the "incident"). On May 1, 2015, Plaintiff filed an amended complaint, naming only Seagroves and "The City of Wilson, N.C." as defendants and seeking to establish liability under § 1983 only. [DE 29]. On October 13, 2015, the court dismissed the City of Wilson. [DE 47].

A.   **Undisputed Facts**

At the outset, the court observes that Defendant fails to take the facts in the light most favorable to Plaintiff, instead relying solely on his own factual version of the events surrounding the stop and the application of force. Based on the evidence before the court, the undisputed admissible facts – stated in the light most favorable to Plaintiff – are as follows.

On June 17, 2011, Defendant was on duty and conducted a traffic stop of a green 1998 Chevy Blazer driven by Plaintiff. Pl.'s Dep. at 16-21; *see* Seagroves Aff. ¶ 5 (describing vehicle as a "green SUV"). Two passengers were in Plaintiff's vehicle – Emunta Carpenter (Plaintiff's son) and Shaquille Cooper (Plaintiff's friend). Pl.'s Dep. at 34:13-22, 94:9-12; Seagroves Aff. ¶ 9. Defendant drove an unmarked patrol vehicle and was accompanied by Officer Snider.[4] Pl.'s Dep. at 43:7-11; Seagroves Aff. ¶ 5. Defendant handcuffed Plaintiff after approaching her vehicle. Pl.'s Dep. at 17-20; Seagroves Aff. ¶ 7. Shortly thereafter, a vehicle arrived at the scene and its three occupants – Leticia Carpenter (Plaintiff's sister), Charnette Carpenter[5] (Plaintiff's cousin) and Lashanda Carpenter (Plaintiff's daughter) – exited the vehicle and walked towards Defendant and Plaintiff. Pl.'s Dep. at 34:8-13, 35:23-25, 36:1-12, 96:1-5. Leticia, standing close to Plaintiff, directly confronted Defendant, who unholstered his Taser in response. Pl.'s Dep. at

---

[4]   Officer Snider's involvement in the traffic stop was limited to approaching the passenger side of Plaintiff's vehicle and questioning the passengers. Snider Aff. ¶ 5 [DE 56-2]; Seagroves Aff. ¶ 9 [DE 56-1].

[5]   While unclear, it appears Plaintiff's cousin's name is referenced as both "Charnette" and "Shanique" in the deposition transcript. *See* Pl.'s Dep. at 34:13-14.

35:15-18, 37:10-20, 39:1-19; Seagroves Aff. ¶¶ 10, 12. At some point, Defendant placed Plaintiff in the front seat of the patrol car followed by the arrival of Plaintiff's mother.[6] Pl.'s Dep. at 37:10-20, 40:12-20, 42:1-5; Seagroves Aff. ¶ 15. Shortly thereafter, everyone departed the scene.

Defendant drove Officer Snider (who sat in the backseat of the patrol car) and Plaintiff (who sat in the front seat) to the magistrate's office. Pl.'s Dep. 24:20-25, 25:2-6, Seagroves Aff. ¶ 16. While en route to that office, Defendant stopped in an area where a fight had broken out. Pl.'s Dep. at 24:8-10; Seagroves Aff. ¶ 16. Both Defendant and Officer Snider exited the vehicle. Pl.'s Dep. at 25:17-21; Seagroves Aff. ¶ 16. Other officers were also at the scene of the fight. Pl.'s Dep. at 26:1-2, 13-17; Seagroves Aff. ¶ 16. At some point, Defendant and Officer Snider returned to the patrol vehicle and proceeded to the magistrate's office. Pl.'s Dep. 31:21-35, 32:1-16; Seagroves Aff. ¶ 17. Ultimately, Defendant issued Plaintiff a citation for reckless driving and released her. Pl.'s Dep. at 32:12-25; Seagroves Aff. ¶ 17.

On June 18, 2011, Plaintiff sought medical treatment from Wilson Medical Center's emergency room for left arm and left hip pain.[7] Pl.'s Dep. at 101:23-25, 102:1-9. A radiology report regarding Plaintiff's left hand indicated "no acute fracture" and "no dislocation." *Id.* at 134:6-11. Plaintiff's pelvis and left hip radiology report indicated the same. *Id.* at 135:1-6. On June 21, 2011, Plaintiff sought medical treatment from Wilson Orthopedic Surgery and Neurology Center for left arm, left wrist and left shoulder pain. *Id.* at 102:23-25, 103:1-3. On July 27, 2011 and September 6, 2011, Plaintiff received treatment from Todd Smith, M.D. for left wrist, left shoulder, left arm and neck pain. *Id.* at 103:5-8, 16-22. A November 11, 2011

---

[6] Neither party provides any details regarding the arrival of Plaintiff's mother.

[7] During Plaintiff's deposition, she was presented with and questioned about various medical records.

report indicated "[a]ll nerve conduction studies were within normal limits." *Id.* at 138:1-4. On November 15, 2011, January 10, 2012, and August 7, 2012, Plaintiff received treatment from "Dr. Anthony" for left neck, left shoulder and left arm pain. *Id.* at 104:2-25. Plaintiff continued to receive treatment after August 2012. *Id.* at 111:4-7. Since the incident, Plaintiff has taken hydrocodone daily for pain. *Id.* at 45:4-15, 46:6-11, 112:21-24.

Plaintiff also testified at her deposition to injuries received after the incident. Plaintiff was in a car wreck approximately one month after the June 17, 2011 traffic stop and suffered unspecified injuries to her back and right leg for which she underwent physical therapy. *Id.* at 133:15-25, 114:1-17, 119:1-9. In April 2012, plaintiff suffered an unspecified left ankle injury arising from a slip and fall accident. *Id.* at 98:7-25, 99:6-19, 101:6-10.

### B. Plaintiff's Factual Account

Not surprisingly, the parties present disputed versions of the remaining facts leading up to, during and following the traffic stop. According to Plaintiff, she had no idea why Defendant and Officer Snider stopped her. Pl.'s Dep. at 17:4-5. When she saw the blue lights on Defendant's vehicle, she thought the police were stopping her pursuant to a driver's license checkpoint. *Id.* at 16:12-19. Accordingly, she retrieved her license and waited for Defendant to approach her vehicle. *Id.* at 16:21-25; 17:1. As Defendant approached Plaintiff's vehicle, he said nothing. *Id.* at 19:2-5. Rather, he "snatched [her] door open," grabbed her left wrist, "snatched [her] out," "handcuffed her," "shoved [her] up against" her vehicle and then advised her "black ass" was going to jail. *Id.* at 17:2-3, 18-24, 19:6-9, 17-23, 20:24-25, 21:1-4. Plaintiff then asked "For what, sir? What did I do?" *Id.* at 17:23-24.

When Leticia, Charnette and Lashanda arrived at the scene, Defendant said nothing to them. *Id.* at 36:13-19. Rather, he unholstered his Taser and pointed it at Leticia's chest. *Id.* at

*Carpenter v. Seagroves*
No. 5:14-CV-352-F
Page 5

36:22-25. Plaintiff "begged" Defendant not to tase her sister because she "was real sick," to which Defendant responded, "I don't give a damn if she is sick." *Id.* at 39:23-25. At some point, Defendant secured Plaintiff in the front seat of the patrol vehicle. *Id.* at 24:20-23.

Following the traffic stop, Defendant "carried [Plaintiff] on different streets," including "Picket Street . . . saying that's where he had followed [Plaintiff] from" and witnessed Plaintiff run stop signs – statements Plaintiff characterized as "lies." *Id.* at 23:18-25. Defendant then proceeded to drive to an area "where a fight was at." *Id.* at 24:8-9. Upon arrival, Plaintiff asked Defendant to take her downtown because she was "scared." *Id.* at 26:3-5. "[F]olks [were] out there with sticks and bats and different things" and Plaintiff feared "somebody was going to get to shooting." *Id.* at 24:15-19. In response, Defendant told Plaintiff to "shut up. Shut your damn mouth. Ain't nobody going to bother with you." *Id.* at 26:7-11. Defendant and Officer Snider then joined other officers on the scene. *Id.* at 26:24-25, 27:1. Plaintiff remained in the vehicle unattended for approximately 15 to 20 minutes. *Id.* at 27:9-21. Only when Plaintiff arrived at the magistrate's office did she learn Defendant was charging her with reckless driving. *Id.* at 32:12-16.

### C.  Defendant's Factual Account[8]

According to Defendant, on the afternoon of June 17, 2011, he was driving an unmarked patrol vehicle and was accompanied by Officer Snider. Seagroves Aff. ¶ 5. They were assisting other City of Wilson patrol units "with ongoing investigations concerning multiple fights in the area." *Id.* At some point, Defendant witnessed the driver of a green SUV "turn in front" of his vehicle in "an erratic and careless manner, almost striking the front of [his] vehicle" then continue "driving aggressively." *Id.* In response, Defendant turned his car around to conduct a

---

[8]  Defendant's factual account is generally corroborated by Officer Snider. *See* Snider Aff. ¶¶ 3-4, 8-10.

traffic stop and "radioed into dispatch communications that [he] was attempting to catch up to [the] SUV." *Id.* As Defendant approached the SUV, he witnessed the driver run a stop sign, "drive erratically, including driving in the opposite lane of travel at times," then make a left turn "above a safe speed." *Id.* ¶ 6. At that point, Defendant activated the blue lights and siren. *Id.* Thereafter, he further observed the driver of the SUV run another stop sign before it "changed lanes, turned onto Hanover Street and [came] to a complete stop."

When Defendant exited his vehicle, he approached the driver's side of the SUV, instructed Plaintiff to exit the SUV and informed her that she was under arrest for careless and reckless driving. *Id.* ¶ 7. Plaintiff exited her vehicle. *Id.* Then, Defendant "turned [Plaintiff] around so that she [ ] fac[ed] the inside of her vehicle and placed her in handcuffs behind her back." *Id.* Plaintiff "was very agitated and upset." *Id.*

Defendant then "attempted" to secure Plaintiff in the patrol car "when an unknown vehicle not associated with the traffic stop pulled up and cornered [Defendant] and [ ] Plaintiff between their vehicles." *Id.* ¶ 10. "Multiple" persons exited the vehicle and "scream[ed]" and "curs[ed]" at Defendant. *Id.* Also, one of the individuals "got directly in [Defendant's] face while [he] had Plaintiff in handcuffs." *Id.* At that point, Defendant unholstered his Taser, "kept it pointed at the ground in the 'low and ready' position," and "commanded" the individuals to leave. *Id.* ¶ 12. At some point, Plaintiff's mother arrived on the scene. *Id.* ¶ 15. Once the individuals left, Defendant holstered his Taser and placed Plaintiff in the front seat of the patrol car. *Id.*

Defendant then proceeded to the magistrate's office with Officer Snider and Plaintiff in tow.[9] On the way there, however, Defendant "happened upon a large fight involving

---

[9] Officer Snider and Plaintiff sat in the back and front seats of the patrol vehicle, respectively. Seagroves

approximately 40 subjects in the vicinity of Goldsboro and Woodrow Streets." *Id.* ¶ 16. After pulling over, he and Officer Snider exited the patrol car. *Id.* While Officer Snider attempted to separate some of the individuals fighting, Defendant "stood outside the passenger door where Plaintiff was seated, standing as a shield between her and the fight across the street." *Id.* After this stop, which lasted no longer than five minutes, Defendant proceeded to the magistrate's office. *Id.* When Defendant saw "victims and family members associated with the large fight" waiting on the magistrate, who "would not return for another 50 minutes," he "un-arrest[ed]" Plaintiff and instead issued a citation for careless and reckless driving. *Id.* ¶ 17.

## II. LEGAL STANDARD

Summary judgment is appropriate where an examination of the pleadings, affidavits and other proper discovery materials before the court demonstrates "there is no genuine dispute as to any material fact," thus entitling the moving party to judgment as a matter of law.[10] FED. R. CIV. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). A fact is "material" if proof of its existence or non-existence might affect the outcome of the litigation. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (explaining "irrelevant or unnecessary" factual disputes do not preclude summary judgment). A factual dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* In considering a motion for summary judgment, a court may not make credibility determinations or engage in any weighing of the evidence. Rather, "the nonmoving party's evidence is to be believed, and all justifiable inferences are to be drawn in that party's favor." *News & Observer Publ'g Co. v. Raleigh-*

---

Aff. ¶ 16.

[10] The evidentiary materials before the court were provided by Defendant only and are limited to the following: (1) Plaintiff's full deposition transcript, dated October 7, 2015 (submitted via mail to the court); (2) Defendant's affidavit [DE 56-1]; (3) Snider's Affidavit [DE 56-2]; (4) Defendant's training records [DE 61-1]; and (5) Report by John E. Combs, School Director and Chief Instructor for the Subject Control/Arrest Techniques and Physical Fitness Training Programs with the North Carolina Justice Academy, stating his opinion as to the reasonableness of Defendant's actions on the day in question and basis therefor [DE 56-4].

*Durham Airport Auth.*, 597 F.3d 570, 576 (4th Cir. 2010) (quoting *Hunt v. Cromartie*, 526 U.S. 541, 552 (1999)).

The movant has the initial burden of showing no genuine issue of material fact exists. *Celotex Corp.*, 477 U.S. at 324. The movant discharges his burden by identifying an absence of evidence to support the non-moving party's case. The non-moving party then must identify specific facts showing there is a genuine issue for trial. *Id.* at 323. In this regard, the non-moving party must convince the court that evidence exists upon which a finder of fact could properly return a verdict in favor of the non-moving party. To meet this burden, the non-movant may not rest on the pleadings, but must designate specific facts in the record – by providing depositions, affidavits, and other competent evidence – establishing a genuine issue of material fact exists. *Id.* at 325. Conclusory allegations, speculation, and unsubstantiated assertions do not suffice. *Thompson v. Potomac Elec. Power Co.*, 312 F.3d 645, 649 (4th Cir. 2002); *see Berckeley Inv. Group, Ltd. v. Colkitt*, 455 F.3d 195, 201 (3d Cir. 2006) ("[S]ummary judgment is essentially 'put up or shut up' time for the nonmoving party: the non-moving party must rebut the motion with facts in the record and cannot rest solely on assertions made in the pleadings, legal memoranda, or oral argument."). If the non-movant fails to meet her burden, summary judgment must be granted. *Celotex*, 477 U.S. at 322. Even though the court construes a *pro se* litigant's filings liberally, *see Erickson v. Pardus*, 551 U.S. 89, 94 (2007), "the special judicial solicitude with which a district court should view . . . pro se [filings] does not transform the court into an advocate." *United States v. Wilson*, 699 F.3d 789, 797 (4th Cir. 2012).

### III.  DISCUSSION

Plaintiff brings this action pursuant to 42 U.S.C. § 1983. Section 1983 is not a source of substantive rights. Instead, it provides a remedy to redress violations of federal law grounded in

federal constitutional provisions or statutes. *Baker v. McCollan*, 443 U.S. 137, 145 n.3 (1979). To prevail on a claim under § 1983, a plaintiff must establish that (1) a person deprived her of a right secured by the Constitution or laws of the United States (2) while acting under the color of state law. *West v. Atkins*, 487 U.S. 42, 48 (1988).

Plaintiff claims Defendant – while "acting under color and authority of state law" – "physically terrorized and brutalized" her when he "snatched" her out of her vehicle, threw her against it and "twisted" her arm behind her back as he handcuffed her for the "fabricated . . . charge of reckless driving."[11] Am. Compl. at 5-6. Defendant denies the alleged conduct complained of by Plaintiff gives rise to a constitutional violation.[12] Nevertheless, argues Defendant, even if the court concludes the facts are sufficient to prevent summary judgment in his favor on the constitutional claim, he is entitled to qualified immunity.[13]

### B. Liability of Defendant in his Individual Capacity

The issue presented here is whether Plaintiff's constitutional rights under the Fourth Amendment were violated by Defendant's conduct during the stop, *see Graham v. Connor*, 400 U.S. 386, 387 (1989) (explaining excessive force claims are analyzed under the Fourth Amendment), and if so, whether Defendant can be held liable for that violation.

---

[11] Plaintiff makes several references to Defendant yelling and cursing at her. Taking those allegations as true for purposes of this motion, yelling and cursing do not amount to a constitutional violation. *See, e.g., Lamar v. Steele*, 698 F.2d 1286, 1287 (5th Cir. 1983) ("Threats alone are not enough. A section 1983 claim only accrues when the threats or threatening conduct result in a constitutional deprivation."); *Keyes v. Albany*, 594 F. Supp. 1147, 1155 (N.D.N.Y 1984) (holding "the use of vile and abusive language, [including racial epithets,] no matter how abhorrent or reprehensible, cannot form the basis for a § 1983 claim").

[12] Defendant does not dispute that he acted under the color of state law at the time of Plaintiff's stop on June 17, 2011.

[13] "Qualified immunity is typically an immunity from suit, rather than a mere defense to liability, and is effectively lost if a case is permitted to go to trial." *Gregg v. Ham*, 678 F.3d 333, 339 (4th Cir. 2012). However, "if a dispute of material fact precludes a conclusive ruling on qualified immunity at the summary judgment stage, the district court should submit factual questions to the jury and reserve for itself the legal question of whether the defendant is entitled to qualified immunity on the facts found by the jury." *Id.*

Government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate "clearly established" statutory or constitutional rights of which a reasonable person would have known.[14] *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982); *accord Henry v. Purnell*, 652 F.3d 524, 532 (4th Cir. 2011). "Underlying the doctrine is a desire to avoid overdeterrence of energetic law enforcement by subjecting governmental actors to a high risk of liability." *Rowland v. Perry*, 41 F.3d 167, 172 (4th Cir. 1994) (citing *Anderson v. Creighton*, 483 U.S. 635, 638 (1987). "The concerns behind the immunity defense are especially salient in the context of street-level police work, which frequently requires quick and decisive action in the face of volatile and changing circumstances." *Id.*

When a government official asserts qualified immunity, the threshold question that a court must answer is whether the facts, when viewed in the light most favorable to the plaintiff, show that the official's conduct violated a federal right. *Ashcroft v. al–Kidd*, 563 U.S. 731, 735 (2011); *accord Doe ex rel. Johnson v. South Carolina Dep't of Soc. Servs.*, 597 F.3d 163, 170 (4th Cir. 2010). If so, the court determines whether the official's conduct was objectively reasonable in view of the "clearly established" law at the time of the alleged event. *Id.* A court may decide "which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances of the particular case at hand." *Pearson v. Callahan*, 555 U.S. 223, 236 (2009). While the plaintiff bears the burden of proof on the first inquiry, the defendant bears the burden of proving the constitutional violation was not "clearly established." *Henry v. Purnell*, 501 F.3d 374, 377-78 (4th Cir. 2007).

---

[14] Of course, if no such right has been violated, the inquiry ends there "because government officials cannot have known of a right that does not exist." *Porterfield v. Lott*, 156 F.3d 563, 567 (4th Cir. 1998).

1. <u>Evidence in the record creates an issue of fact as to whether Defendant violated Plaintiff's constitutional rights under the Fourth Amendment.</u>

The court first considers whether the force used by Defendant to arrest Plaintiff was objectively reasonable as a matter of law – that is, whether the facts, taken in the light most favorable to Plaintiff, show there was no violation of Plaintiff's constitutional rights.

The Fourth Amendment proscribes the use of excessive force by officers while effectuating an arrest. *Graham*, 490 U.S. at 386; *see also Purnell*, 652 F.3d at 531 ("The Fourth Amendment's prohibition on unreasonable seizures includes the right to be fee of seizures effectuated by excessive force."). An officer's actions are analyzed under the Fourth Amendment's "objective reasonableness" standard. *Graham*, 490 U.S. at 388. The reasonableness of the force used to effect a particular seizure is determined by "careful[ly] balancing . . . the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Id.* at 396. That is, the force applied must be balanced against the need for that force.

The court considers first "the nature and quality of the intrusion" on Plaintiff's bodily integrity under the Fourth Amendment. *Graham*, 490 U.S. at 396. That is, the gravity of the particular intrusion that a given use of force imposes upon an individual's liberty interest is measured with reference to the type and amount of force inflicted. Consideration of the governmental interests at stake requires evaluation of such non-exhaustive factors as (1) "the severity of the crime at issue," (2) "whether the suspect poses an immediate threat to the safety of the officers or others;" and (3) "whether he is actively resisting arrest or attempting to evade arrest by flight." *Sigman v. Town of Chapel Hill*, 161 F.3d 782, 786 (4th Cir. 1998) (citing *Graham*, 490 U.S. at 396-97). These factors are simply a means by which to determine objectively "the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at

396-97. Simply put, the court must examine the "totality of the circumstances." *Id*. at 396.

i.   *Nature and Quality of Intrusion*

The evidence does not indicate significant Fourth Amendment intrusion. "It is [ ] well established that the right to make an arrest carries with it the right to use a degree of physical coercion or threat thereof to effect the arrest." *Brown v. Gilmore*, 278 F.3d 362, 369 (4th Cir. 2002) (citing *Saucier v. Katz*, 533 U.S. 194, 208 (2001)). According to Plaintiff's version of events, Defendant grabbed her left wrist, "snatch[ed]" her out of the vehicle, handcuffed her, "shoved [her] up against" her vehicle, yelled her "black ass" was going to jail and left her handcuffed and unattended in the patrol car for over fifteen minutes in a volatile situation. This level of force Defendant employed, however, is low on the continuum of tactics available to police officers. There is no evidence, for example, that Defendant used force, such as kicks, punches, pepper spray, or baton blows, to effectuate Plaintiff's arrest. *See, e.g.*, *Young v. Prince George's Cnty*, 355 F.3d 751, 757-58 (4th Cir. 2004) (officer placed handcuffed plaintiff in a headlock, threw him head-first to the ground, and then beat him); *Jones v. Buchanan*, 325 F.3d 520, 530 (4th Cir. 2003) (officers crushed plaintiff's nose and caused other injuries requiring multiple stitches). In fact, Plaintiff proffers no evidence of an injury of any magnitude. *See Jones v. Buchanan*, 325 F.3d 520, 527 (4th Cir. 2003) (stating the "extent of the plaintiff's injury is [ ] a relevant consideration" in determining whether force was excessive). That said, the court acknowledges a plaintiff may recover "nominal damages without proof of actual injury" for unreasonable intrusions on one's bodily integrity. *Carey v. Piphus*, 435 U.S. 247, 266 (1978) (holding nominal damages are available under 42 U.S.C. § 1983). Accordingly, although the Fourth Amendment intrusion was not significant, neither can it be considered minimal based on Plaintiff's version of events.

ii.  *Governmental Interests at Stake*

The court next considers the severity of the crime, the immediacy of the threat, and whether Plaintiff evaded arrest to determine whether the use of force was reasonable.

Regarding the severity of the offense, Plaintiff contends she did not commit any traffic violation. "When the subject of a seizure has not committed any crime, this factor weighs heavily in the subject's favor." *Estate of Armstrong ex rel. Armstrong v. Vill. of Pinehurst*, 810 F.3d 892, 899 (4th Cir. 2016) (brackets omitted); s*ee Turmon v. Jordan*, 405 F.3d 202, 207 (4th Cir. 2005) ("[T]he severity of the crime cannot be taken into account because there was no crime."). Defendant counters that Plaintiff was pulled over because she was driving aggressively and erratically. Even if true, "when the offense [i]s a minor one, . . . the first *Graham* factor weigh[s] in plaintiff's favor . . . ." *Armstrong*, 810 F.3d at 899. Traffic violations are not generally classified as serious offenses. *See Argersinger v. Hamlin*, 407 U.S. 25, 38 n.9 (1972) (describing traffic violations as "non-serious" offenses).

The court next turns to whether Plaintiff posed an immediate threat to the safety of Defendant. Plaintiff was unarmed and never attempted to harm Defendant in any way. *Cf. Anderson v. Russell*, 247 F.3d 125, 130 (4th Cir. 2001) ("evidence conclusively established" that the officer "reasonably perceived" plaintiff "to be armed with a gun"). There is no evidence that Plaintiff posed an immediate threat to Defendant's or Officer Snider's safety requiring an instantaneous decision or reaction.

Finally, the court considers whether Plaintiff resisted or attempted to evade arrest. Here, Plaintiff – despite being "very agitated and upset" – exited the vehicle without incident. Seagrove Aff. ¶ 7. There is no evidence, for example, of Defendant repeatedly asking Plaintiff to exit her car and her refusing. *See Armstrong*, 810 F.3d at 904 (stating a suspect "actively

resist[s] arrest [when] she refuse[s] to get out of her car when instructed to do so and stiffen[s] her body and clutche[s] her steering wheel to frustrate the officers' efforts to remove her from her car") (quoting *Mattos v. Agarano*, 661 F.3d 433, 446 (9th Cir. 2011)). The evidence establishes that Plaintiff did not resist arrest.

iii. *Weighing the conflicting interests*

Viewing the facts presented by the record in a light most favorable to Plaintiff, the court cannot say that force used by Defendant was objectively reasonable as a matter of law. Despite Plaintiff's non-resistance, Defendant forcefully removed Plaintiff from her car, grabbed her wrist, handcuffed her and shoved her against her vehicle. Also, Defendant left Plaintiff handcuffed and unattended in a patrol vehicle in an area where fighting was underway. Weighing the type and amount of force against the government's countervailing interests, the evidence supports a finding that the force used was excessive. The court recognizes that police officers' decisions about the appropriate amount of force to use in a given circumstance "are often . . . split-second judgments [made] in circumstances that are tense, uncertain, and rapidly evolving." *Graham*, 490 U.S. at 396-97. However, the situation here was far from that of a lone police officer suddenly confronted by a dangerous person threatening immediate violence: Plaintiff was eventually charged only with the reckless driving. Accepting Plaintiff's version of the events as true, the court concludes that a genuine issue of material fact exists as to whether Defendant used excessive force against Mr. Johnson.

2. <u>It was not clearly established at the time of the incident that Defendant's actions against Plaintiff violated her rights.</u>

Having determined that Plaintiff has proffered evidence supporting a constitutional violation, the court considers whether the constitutional right was "clearly established" at the

time of the incident in question.[15] On June 17, 2011, the right to be free from excessive force during a traffic stop when no circumstances warranting force existed was clearly established. *See Saucier*, 533 U.S. at 201-02 (stating "there is no doubt that [case law] clearly establishes the general proposition that use of force is contrary to the Fourth Amendment if it is excessive under objective standards of reasonableness"). The focus of the "clearly established" inquiry, however, "is not upon the right at its most general or abstract level, but at the level of its application to the specific conduct being challenged." *Pritchett v. Alford*, 973 F.2d 307, 312 (4th Cir. 1992) (citations omitted); *see Saucier*, 533 U.S. at 201 (explaining the "clearly established" inquiry is "undertaken in light of the specific context of the case, not as a broad general proposition"); Accordingly, the proper inquiry is whether "a reasonable officer could have believed" Defendant's actions – forcefully removing Plaintiff from her car, grabbing her wrist, handcuffing her and shoving her against her vehicle – "w[ere] lawful, in light of clearly established law and the information [Defendant] possessed at the time."[16] *Orem v. Rephann*, 523 F.3d 442, 448-49 (4th Cir. 2008) (citation omitted).

"Though it focuses on the objective facts, the immunity inquiry must be filtered through *the lens of the officer's perceptions* at the time of the incident in question." *Rowland v. Perry*, 41 F.3d 167, 173 (4th Cir. 1994) (emphasis added). Using the officer's perception of facts "serves two purposes." *Id.* First, it "limits second[-]guessing the reasonableness of actions with the

---

[15] The applicability of qualified immunity regarding the existence of a clearly established right is a question of law. *Willingham v. Crooke*, 412 F.3d 553, 560 (4th Cir. 2005).

[16] Both the "clearly established" test and the test on the merits (i.e., whether a federal right was violated) rely on an objective appraisal of the reasonableness of the force employed." *Rowland v. Perry*, 41 F.3d 167, 173 (4th Cir. 1994). The "clearly established" test, however, is more than a mere reiteration of the *Graham* factors applied above. Even if an action is unreasonable under the Fourth Amendment, it is not unreasonable under a qualified immunity defense if the defendant could nonetheless have reasonably believed that the force employed was constitutional in light of the circumstances. *See Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

benefit of 20/20 hindsight." *Id.* (citing *Graham*, 490 U.S. at 396). Second, it "limits the need for decision-makers to sort through conflicting versions of the actual facts, and allows them to focus instead on what the police officer reasonably perceived."[17] *Id.* Thus, qualified immunity "applies regardless of whether the government official's error is a mistake of law, a *mistake of fact*, or a mistake based on mixed questions of law and fact." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (emphasis added) (internal quotation marks and citation omitted). Put differently, it protects "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986).

Here, Defendant was acting within his lawful authority to conduct a traffic stop and Defendant's actions were reasonable in light of Defendant's perceived reality of the situation – a perception echoed by Officer Snider. *See* Snider Aff. ¶ 5. From Defendant's perspective, he was dealing with a driver who almost hit the patrol vehicle, drove at an excessive speed, swerved into the wrong lane on two occasions and ran several stop signs. While "[t]raffic violations generally will not support the use of a significant level of force," *Bryan v. MacPherson*, 630 F.3d 805, 828 (9th Cir. 2010), here, the perceived traffic violations suggested an erratic driver who posed a threat to the safety of officers and others. The court is "aware of no evidence, however, that [Defendant's] mistaken perception – if in fact it was mistaken – was unreasonable." *Gooden v. Howard Cnty*, 954 F.2d 960, 965-966 (4th Cir. 1992); *cf. Brown v. City of Golden Valley*, 574 F.3d 491, 497 (8th Cir. 2009) (denying qualified immunity to an officer who used a taser on a passenger who refused to terminate a 911 call to an operator during a traffic stop because

---

[17] As the Fourth Circuit noted, "it will nearly always be the case that witnesses . . . differ over what occurred. That inevitable confusion, however, need not signify a difference of triable fact." *Gooden v. Howard Cnty*, 954 F.2d 960, 965 (4th Cir. 1992). "Instead, in determining the information the . . . officers possessed, the court must determine what the police reasonably perceived the reality to be." *Id.* (quotation marks and internal citation omitted).

"whether [the officer] reasonably interpreted her refusal as a realistic threat to his personal safety or whether it constituted nothing more than an affront to his command authority is a matter for a jury to decide"). Accordingly, Defendant is entitled to qualified immunity on the excessive force claim.

### B.  Liability of Defendant in his Official Capacity

Plaintiff has also sued Defendant in his official capacity as a police officer for the City of Wilson.

For purposes of § 1983, it is well accepted that claims against police officers in their official capacities are treated as claims against the municipality that the officers serve. *McMillian v. Monroe County*, 520 U.S. 781, 785 n.2 (1997); *Kentucky v. Graham*, 473 U.S. 159, 166 (1985). That is, in an official-capacity suit, the real party in interest is the municipality not the named official. *Hafer v. Melo*, 502 U.S. 21, 25 (1991). To establish § 1983 liability against a municipality, a plaintiff must show that the constitutional injury is proximately caused by (1) a written policy or ordinance; (2) "decisions of a person with final policymaking authority;" (3) "an omission, such as a failure to properly train officers, that manifests deliberate indifference to the rights of citizens;" or (4) a practice "so persistent and widespread as to constitute a custom or usage with the force of law." *Lytle v. Doyle*, 326 F.3d 463, 471 (4th Cir. 2003). The record contains no such evidence.[18] Thus, summary judgment is appropriate on Plaintiff's claim against Defendant in his official capacity.

---

[18]  In fact, the court earlier ruled that Plaintiff failed to state a claim against the City of Wilson. *See* October 13, 2015 Order [DE 47]. In its Order, the court found the only allegation against the City of Wilson was limited to its police department bearing "responsibility for training its officers how to act with the public." *Id.* at 6.

## IV. CONCLUSION

For the foregoing reasons, Defendant's motion for summary judgment [DE 55] is ALLOWED. The Clerk of Court is DIRECTED to close this case.

SO ORDERED.

This the 13th day of June, 2016.

*James C. Fox*
JAMES C. FOX
Senior United States District Judge